830 P.2d 807

ARIZONA CORPORATION COMMIS-SION, Marcia Weeks, Renz D. Jennings and Dale H. Morgan, as members of said Commission, Petitioners,

v.

STATE of Arizona ex rel. Grant WOODS, the Attorney General, Respondent,

and

The Mountain States Telephone and Telegraph Company, Pinnacle West Capital Corporation, US West New Vector Group, Inc., Arizona Sierra Utility Company, First National Utilities, Inc., Bella Vista Water Company, Granite Oaks Water Users Association, Water Utility of Greater Buckeye, West Valley Utility Water Combine, Tucson Electric Power Company, Arizona Public Service Company, Citizens Utilities Company/Phelps Dodge Corporation, Morenci Water & Electric Company, AJO Improvement Company, Alltell Corporation, CP National Corporation, Great Southwest Telephone Company, Inc., Navajo Communications Company, Inc., Southern Union Company, Southwest Gas Corporation, Intervenors.

No. CV–91–0082–SA.

Supreme Court of Arizona, En Banc.

April 21, 1992.
Reconsideration Denied June 16, 1992.

Arizona Corp. Com'n by Janet Wagner, Christopher C. Kempley, Phoenix, for petitioners.

Grant Woods, Atty. Gen. by Grant Woods, Charles S. Pierson, Phoenix, for respondent.

Dennis R. Nelson, Tucson, for Tucson Elec. Power Co.

W. Douglas Hickey, Phoenix, for Mountain States Tel. & Tel. Co.

Fennemore Craig, P.C. by C. Webb Crockett, Timothy Berg, Phoenix, for Mountain States Tel. & Tel. Co., Tucson Elec. Power Co.

Beus, Gilbert & Morrill by Susan P. Segal, Phoenix, for Pinnacle West Capital Corp.

Johnston Maynard Grant & Parker by Michael M. Grant, Catherine M. Cheney, Phoenix, for US West New Vector Group, Inc.

Martinez & Curtis, P.C. by Michael A. Curtis, William P. Sullivan, James M. Flenner, Phoenix, for Arizona Sierra Utility Co., First Nat. Utilities, Inc., Bella Vista Water Co., Granite Oaks Water Users Ass'n, Water Utility of Greater Buckeye, West Valley Utility Water Combine.

Snell & Wilmer by Steven M. Wheeler, Thomas L. Mumaw, Phoenix, for Arizona Public Service Co.

Brown & Bain, P.A. by Lex J. Smith, Terence W. Thompson, Charles S. Price, Phoenix, for Citizens Utilities Co./Phelps Dodge Corp., Morenci Water & Elec. Co., Ajo Imp. Co., Alltell Corp., CP Nat. Corp., Great Southwest Telephone Co., Inc., Navajo Communications Co., Inc., Southern Union Co.

Southwest Gas Corp. by Andrew W. Bettwy, Las Vegas, for Southwest Gas Corp.

## OPINION

FELDMAN, Chief Justice.

In this special action, the petitioner, Arizona Corporation Commission (the "Commission"), challenges the Arizona Attorney General's refusal to certify certain rules proposed by the Commission. The proposed rules give the Commission governance over various transactions between public service corporations and their corporate affiliates. The narrow procedural issue before us is whether the Attorney General failed to perform a duty required by Arizona's Administrative Procedure Act, under A.R.S. § 41–1041, when he refused to certify the proposed rules.

The underlying substantive issue before us is whether article 15, section 3 of the Arizona Constitution gives the Commission power to require a public service corporation to report information about, and obtain permission for transactions with, its parent, subsidiary, and other affiliated corporations. The Attorney General and a number of public service corporations (the "Utilities Group") that have been allowed to intervene claim the proposed rules exceed the Commission's jurisdiction because they are not connected to its ratemaking functions and also violate the Commerce Clause of the United States Constitution.

## I. SPECIAL ACTION JURISDICTION

■ This court has original jurisdiction over issuance of extraordinary writs[1] against state officers under article 6, section 5.1 of the Arizona Constitution. *Arizona Corp. Comm'n v. Superior Court*, 107 Ariz. 24, 25–26, 480 P.2d 988, 989–90 (1971). Agreeing that the Commission lacks a remedy by appeal, the Attorney General and the Commission both emphasize that the issues presented are questions

---

1. In Arizona, relief formerly obtained by writs of prohibition, mandamus or certiorari is now obtained by "special action." Rule 1, Arizona Rules of Procedure for Special Actions, 17B A.R.S.

of first impression and statewide importance. They submit that these factors make it appropriate for this court to exercise its discretion to accept jurisdiction. *See United States v. Superior Court,* 144 Ariz. 265, 269, 697 P.2d 658, 662 (1985).

The Utilities Group argues that we should not accept special action jurisdiction because the issues pertaining to the rules are presently before the superior court on a related matter. It contends that the Commission therefore has a plain, speedy, and adequate remedy in the superior court, and we should decline jurisdiction under Rule 1(a), Ariz.R.P.Spec.Act., 17B A.R.S.

We agree with the Commission and Attorney General that the extent of the Commission's constitutional power to regulate transactions between public service corporations and their affiliates is an urgent question with great importance to the people of this state. Additionally, the purely legal issues presented can be conveniently decided at this stage because they do not require the submission of evidence, are separate from the issues pending in the superior court, and have been a topic of concern, according to the Attorney General, for more than five years.

Noting that the special action could have been commenced in the superior court, *see*

**2.** Given our decision to accept jurisdiction, we need not decide whether the court of appeals has original jurisdiction to issue a writ of mandamus to a state officer by special action. *Compare* A.R.S. § 12–120.21(A)(3) (granting court of appeals jurisdiction to issue writs and orders necessary and proper for its appellate jurisdiction) *and Goodrich v. Indus. Comm'n,* 11 Ariz. App. 244, 245, 463 P.2d 550, 551 (1970) (construing A.R.S. § 12–120.21 to prohibit court of appeals *original* jurisdiction to issue writs of mandamus) *with* A.R.S. § 12.120.21(A)(4) (granting court of appeals jurisdiction to hear special action petitions "without regard to its appellate jurisdiction") *and Pioneer Trust Co. v. Pima County,* 168 Ariz. 61, 64 n. 1, 811 P.2d 22, 25 n. 1 (1991) (recognizing that establishment of court of appeals generally understood impliedly to amend statutory grants of jurisdiction to supreme court).

**3.** The Order provided that the Proposed Rules could become effective without certification by the Attorney General. The Attorney General brought an action pursuant to A.R.S. § 40–254 to have the Order modified to make the Proposed Rules subject to the APA requirements. After the Utilities Group also filed actions that

*Arizona Corp. Comm'n,* 107 Ariz. at 26, 480 P.2d at 990, the Utilities Group argues that the Commission also could have brought this special action in the court of appeals. While all this may be true, we believe this court can best serve the public interest and principles of judicial economy by resolving fundamental legal questions regarding the Commission's constitutional power at this time.[2] We therefore accepted jurisdiction of the special action and now turn to the issues raised in the petition.

## II. FACTS AND PROCEDURAL HISTORY

On March 14, 1990, the Commission promulgated A.A.C. R14–2–801 through R14–2–806 (the "Proposed Rules") in Commission Decision No. 56844 (the "Order") (the full text of R14–2–801 to R14–2–806 is set forth in Appendix A attached hereto). The Commission later submitted the Proposed Rules to the Attorney General for certification pursuant to the Administrative Procedure Act (the "APA"). *See* A.R.S. § 41–1041.[3] A.R.S. § 41–1041(A) provides, in pertinent part, that:

> The attorney general shall review and certify that the proposed rule is:
>
> 1. Approved as to form.

were consolidated with the Attorney General's for determination of the APA issues, the trial court entered judgment on October 15, 1990, modifying the Order and holding, in effect, that the Proposed Rules are subject to the APA, in particular A.R.S. § 41–1041. The Commission appealed that ruling, and that appeal is presently before the court of appeals. At the same time, but without waiving the APA issues on appeal, the Commission requested that the Attorney General proceed with the certification process, notwithstanding the appeal. The trial court judgment also expressly reserved other challenges raised by the Utilities Group, including the claim that the Proposed Rules went beyond the Commission's jurisdiction.

The positions of the parties in the present case make it obvious that, regardless of the outcome of the issues before the court of appeals (whether the APA requires Attorney General certification of the Proposed Rules), the substantive issue of whether the Commission has the power to regulate transactions between a public service corporation and its parent, subsidiary, and other affiliated corporations must be decided.

2. Clear, concise and understandable.

3. Within the power of the agency to adopt and within the legislative standards enacted.

4. Adopted in compliance with the appropriate procedures.

Pursuant to A.R.S. § 41–1041(D), the Attorney General informed the Commission that he would not certify the Proposed Rules because they were not within the Commission's power to adopt. Letter of record from the Honorable Grant Woods, Attorney General, to James Matthews, Executive Secretary, Arizona Corporation Commission (Jan. 22, 1991).

The Proposed Rules fall into three categories: (1) definitions—defining the rules' terms and scope of application; (2) reporting requirements—requiring certain information to be filed with the Commission and/or maintained by the utility and its affiliates; and (3) approval provisions—requiring public service corporations to obtain the Commission's prior approval for certain transactions. The Attorney General and the Utilities Group attack the reporting and approval requirements. The former require notice from any utility or affiliate intending to organize or reorganize a public utility holding company. The notice must disclose specific information regarding the proposed holding companies: the officers and directors and their business purposes, various financial and organizational information, diversification plans, and anticipated changes in the utility's costs and services. *See* Proposed Rule R14–2–803(A), (B). The informational rules

also permit the Commission to gain access to an affiliate's books and records regarding its transactions with a public utility. *See* Proposed Rule R14–2–804(A), (E). Finally, the rules require annual reports from utilities and their holding companies regarding diversification plans and business activities between affiliates and the utility. *See* Proposed Rule R–14–2–805(A), (B).

The approval rules require utilities to obtain Commission approval of the organization or reorganization of utility holding companies. *See* Proposed Rule R14–2–803(C). These rules also require Commission approval of transactions by which utility corporations acquire or assume any financial interest in, or liabilities of, certain affiliates, lend to those affiliates, or use utility funds to form a subsidiary. *See* Proposed Rule R14–2–804(B), (C), (D).

According to the Commission, the Proposed Rules are its response to a diversification movement by Arizona public utilities. Specifically, the Commission adopted the rules after the largest public utility in Arizona, Arizona Public Service Company (APS), created a utility holding company now known as Pinnacle West Capital Corporation ("Pinnacle West"). After the APS shareholders approved that corporate reorganization, the Commission issued an order requiring reports from APS and Pinnacle West's predecessor concerning transactions between the two entities, as well as information regarding the holding company's diversification plans and activities with subsidiaries.[4] Our courts issued two opinions

**4.** As background to the Proposed Rules, we also take notice of the existence of other transactions illustrating Arizona utilities' diversification movement, most notably with the Tucson Electric Power Company and its affiliates. Tucson Electric also reorganized, and that reorganization, along with subsequent transactions with its affiliates, spinoffs, and similar dealings, allegedly led to its insolvency or near-insolvency. Creditors eventually petitioned to place Tucson Electric into involuntary proceedings under Chapter 11 of the Bankruptcy Code. *See* 11 U.S.C. § 303. The company just recently procured a dismissal of the petition, along with a rate increase that it claimed was necessary to its financial survival. *In re Tucson Elec. Power Co.*, No. 91–0251–TUC–LO (Bankr.D.Ariz. Dec. 31, 1991) (dismissal order); *see generally* Rich-

ard Ducote, *TEP Escapes Bankruptcy, Wins Rate Hike,* Ariz. Daily Star, Jan. 1, 1992, at A1; Max Jarman, *Tucson Electric's Nightmare,* Ariz.Bus. Gazette, May 13, 1991, at 1.

Additionally, we take notice that the corporate conglomerate formed by Pinnacle West after the APS reorganization allegedly has faced serious financial difficulties, including financial problems of various affiliates and a threat by Pinnacle West to seek protection under Chapter 11 of the Bankruptcy Code. *See generally* Anthony Sommer, *Utility Regulator Faces Test as Feud Reaches High Court,* Phoenix Gazette, June 5, 1991, at A1, A4; David Schwartz, *$1.7 Billion Offered for APS,* Ariz. Republic, Nov. 9, 1989, at A1, A11.

We do not assess the accuracy of these articles or their contents, nor the propriety or impro-

discussing that Commission order. In *Arizona Public Service Co. v. Arizona Corporation Comm'n,* 155 Ariz. 263, 746 P.2d 4 (Ct.App.1987) (*APS I*), the court of appeals held that the Commission could require information from the public service corporation but not the holding company. This court partially vacated the latter holding and concluded that the Commission could also require reports from the holding company. *See Arizona Pub. Serv. Co. v. Arizona Corp. Comm'n,* 157 Ariz. 532, 760 P.2d 532 (1988) (*APS II*). This court noted that the Commission, in its order, expressed its concern that

> its regulatory authority over public utility companies would be weakened and bypassed by the establishment of holding companies. To insure reliable utility service at fair and reasonable rates and to safeguard against such practices as the misuse of public utilities' assets or credit by a non-regulated affiliate, the Commission anticipated a formal adoption of rules and regulations addressing the restructuring and diversification of public service corporations and their holding companies.

*APS II,* 157 Ariz. at 533, 760 P.2d at 533. The Proposed Rules in this case are those anticipated in *APS II.*

The attack on the Proposed Rules is different from that raised in the APS cases and goes to the very heart of the Commission's regulatory powers. In essence, the Attorney General and the Utilities Group argue that under article 15, section 3, the Commission's regulatory power is limited to enactment of rules that directly relate to classifications of service, approval of charges, and the setting of rates of return. The Proposed Rules, according to the Attorney General and the Utilities Group, are not so related and thus exceed the Commission's regulatory powers. To determine the extent of those powers, we first examine the framers' intent in establishing the Commission as a separate, elected body.

## III. HISTORICAL BACKGROUND OF THE COMMISSION

The framers of the Arizona Constitution created the Commission in article 15, providing that it should have "full power" to regulate, set rates, and make reasonable rules for public service companies. Ariz. Const. art. 15, § 3; *see generally* Deborah Scott Engelby, Comment, *The Corporation Commission: Preserving its Independence,* 20 Ariz.St.L.J. 241, 244–48 (1988); *Records of the Arizona Constitutional Convention of 1910,* at 967–81 (John S. Goff ed., 1991) (hereinafter *Constitutional Convention*). The framers established the Commission as a separate, popularly-elected branch of state government. Section 1 of article 15 establishes a Commission of three members, each elected for a six-year term in a statewide election. Arizona voters have protected the independence of the Commission—especially its provisions regarding election of commissioners—from constitutional amendment on numerous occasions. *See* John D. Leshy, *The Arizona State Constitution: A Reference Guide* (prepublication manuscript 1991), at 629 (hereinafter *State Constitution*).

The founders expected the Commission to provide both effective regulation of public service corporations and consumer protection against overreaching by those corporations. *Constitutional Convention, supra,* at 612–15, 967–81; Engelby, *supra,* 20 Ariz.St.L.J. at 242–43. The progressive and labor forces, two strong ideological influences at the constitutional convention, combined to promote strong commission authority to regulate corporations, although the strongest power ultimately was limited to regulation of public service corporations. John D. Leshy, *The Making of the Arizona Constitution,* 20 Ariz.St.L.J.

priety of such alleged organizational dealings but take notice of the situation under Rule 201, Ariz.R.Evid., 17A A.R.S., as part of the public concerns that, the Commission argues, necessitated adoption of the Proposed Rules. *Cf. In re Ronwin,* 139 Ariz. 576, 580 n. 4, 680 P.2d 107, 111 n. 4 (1983) (taking notice of various case files, and stating "[w]e take notice that the cases exist, that allegations are made, etc. We cannot and do not take notice of the truth or falsity of specific allegations *except* as established by final judgment."), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983).

1, 88 (1988) (hereinafter *Making the Arizona Constitution*); *see also APS II*, 157 Ariz. at 535, 760 P.2d at 535 (citing and quoting Gordon Morris Bakken, *The Arizona Constitutional Convention of 1910*, 1978 Ariz.St.L.J. 1, 15 (1978)).

These ideological groups shared a strong distrust of corporate powers. *Making the Arizona Constitution, supra*, at 88–89. As one influential framer, Michael Cunniff, argued, "in almost every state ... corporations have altogether too much influence in the [state's] direction and control." *Journal of the Constitutional Convention of Arizona* 435 (Cronin comp. 1925) (*quoted in Making the Arizona Constitution, supra*, at 88–89). *See Making the Arizona Constitution, supra*, at 35 (discussing the influence of Michael Cunniff at the convention).

Further, as this court noted four years after our constitutional convention, at the time of the convention there was a "deep-rooted dissatisfaction" with legislative efforts to regulate public service corporations. *State v. Tucson Gas, Elec. Light & Power Co.*, 15 Ariz. 294, 305, 138 P. 781, 785 (1914). Constraints on legislators' time, the lack of information, and inadequate means of investigation limited the ability of legislatures to oversee public service corporations. These factors often resulted in litigation of legislative regulatory actions and thus substantially hampered effective regulation by shifting the burden of regulation, including setting classifications, rates, and charges, to the courts. *Id.; see* Engelby, *supra*, at 243.

The framers therefore followed the newest western states in providing a constitutional basis for popular control of corporate regulation by creating an elected commission with broad powers. *Making the Arizona Constitution, supra*, at 88–89. While the provision creating the Commission was patterned after the Virginia and Oklahoma constitutions, courts and commentators have argued that the Arizona Constitution gives the Commission more extensive power and jurisdiction than its counterparts in other states. *See, e.g.,*

*Tucson Gas*, 15 Ariz. at 300, 307, 138 P. at 783, 786; Engelby, *supra*, at 244.

The language used in establishing the Commission's powers is broad. Article 15, section 3 provides:

The Corporation Commission shall have *full power to*, and shall, *prescribe* just and reasonable *classifications* to be used and just and reasonable *rates and charges* to be made and collected, by public service corporations within the State for service rendered therein, and *make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State*, and may prescribe the forms of contracts and the systems of keeping accounts to be used by such corporations in transacting such business, *and make and enforce reasonable rules, regulations, and orders for the convenience, comfort, and safety, and the preservation of the health, of the employees and patrons of such corporations;* Provided, that incorporated cities and towns may be authorized by law to exercise supervision over public service corporations doing business therein, including the regulation of rates and charges to be made and collected by such corporations; Provided further, that classifications, rates, charges, rules, regulations, orders, and forms or systems prescribed or made by said Corporation Commission may from time to time be amended or repealed by such Commission.

(Emphasis added.)

Similar to fairly contemporaneous federal antitrust and regulatory legislation, the Arizona provisions were designed to promote both democratic control and competitive economic forces. *Making the Arizona Constitution, supra*, at 89–90. Thus, the Commission has judicial, executive, and legislative powers. *Tucson Gas*, 15 Ariz. at 306, 138 P. at 786. The Commission exercises its executive, administrative function in adopting rules and regulations, its judicial jurisdiction in adjudicating grievances, and its legislative power in ratemaking. *See* Engelby, *supra*, at 245. The Commis-

sion is required to use these powers to regulate public service corporations in the public interest. *Southern Pac. Co. v. Arizona Corp. Comm'n*, 98 Ariz. 339, 342, 404 P.2d 692, 694 (1965); *see generally* Engelby, *supra*, at 245. Thus, the founders' intent and the text gave the elected Commission a strong role in protecting the public interest through regulation of public service corporations. *See* Engelby, *supra*, at 244–45; *see also Making the Arizona Constitution, supra*, at 90–91.

## IV. ARIZONA PRECEDENT REGARDING COMMISSION POWER

### A. Expansion—*Tucson Gas* and *Arizona Eastern Railroad*

Early case law effectuated the founders' broad grant of powers to the Commission. In 1914, this court stated that the Commission has the *exclusive* power to exercise the duties given it in article 15, section 3. *Tucson Gas*, 15 Ariz. at 301, 138 P. at 783–84. The court held that a statute regulating utility rates conflicted with the Commission's exclusive ratemaking power and thus was invalid. *Id.* at 308, 138 P. at 786. In so doing, this court stated that

> [i]t was clearly the policy of the framers of the Constitution, and the people in adopting it, to take the powers of supervision, regulation and control of public utilities from the legislative branch and vest them in the Corporation Commission. . . .

*Id.* at 302, 138 P. at 784. The framers recognized that "chaotic conditions" surrounded the business of corporations and thus created the Commission as "another department of government, with powers and duties as well defined as any branch of the government. . . . Its exclusive field may not be invaded by either the courts, the legislat[ure] or executive." *Id.* at 306, 138 P. at 786.[5]

Four years later, this court further explained the Commission's powers in relation to the legislature's role in governing public service corporations in *Arizona Eastern Railroad v. State*, 19 Ariz. 409, 171 P. 906 (1918). The court held that the Commission's *exclusive* power under article 15, section 3 was limited to its jurisdiction to prescribe reasonable classifications and rates, including such pertinent rules and regulations "by which such corporations shall be governed in the transaction of business within the state." *Id.* at 413–14, 171 P. at 908 (citing Ariz. Const. art. 15, § 3) (emphasis omitted). From the later, permissive language of section 3 (that the Commission "may . . . make and enforce reasonable rules, regulations and orders for the convenience, comfort, and safety and the preservation of health of the employees and patrons of public service corporations"), the court seemingly determined that the Commission and the legislature have *concurrent* jurisdiction to regulate public service corporations in areas other than ratemaking. *Arizona E. R.R.*, 19 Ariz. at 415–16, 171 P. at 909. Thus, a statute regulating the length of railroad trains travelling through the state was constitutional. *Id.* at 410, 416, 171 P. at 906–07, 909.

### B. Contraction—*Pacific Greyhound Lines* and its Progeny

In 1939, this court substantially limited the Commission's power by narrowly construing article 15, section 3. In *Corporation Comm'n v. Pacific Greyhound Lines*, 54 Ariz. 159, 94 P.2d 443 (1939), the Commission challenged the legislature's power to enact a statute limiting the Commission's authority to license common carriers. In so doing, the court limited *Tucson Gas* to its holding regarding ratemaking functions for public service corporations. *Pacific Greyhound*, 54 Ariz. at 168, 94 P.2d at 447. Apparently misconstruing the holding in *Arizona Eastern Railroad*, the *Pacific Greyhound* court stated that *Tucson Gas* "referred solely to classifications, rates and charges, and that it was no guide to the question as to whether the [C]om-

---

**5.** Two of the three justices on the court at that time, Chief Justice Alfred Franklin and Justice D.L. Cunningham, had been delegates to the constitutional convention in 1910. *See Making the Arizona Constitution, supra,* at 40.

mission had the right to regulate other activities of a public service corporation." *Pacific Greyhound*, 54 Ariz. at 171–72, 94 P.2d at 448.[6]

Instead of comparing the result of such a restriction of the Commission's power with the framers' intent in creating the Commission, the court "decided to re-examine, as an original question, the extent of the authority of the commission as to regulation of the business of such corporations on other matters than the three enumerated [that deal with ratemaking]." *Id.* at 168, 94 P.2d at 447. It then examined the general rules governing corporations under article 14 of the Arizona Constitution and cases interpreting sections 3, 5, 6, and 10 of article 15. It determined that "it is evident ... that we did not intend to hold section 3 had the extremely broad meaning which it is claimed we did give it in the Tucson Gas Company case." *Id.* at 170–71, 94 P.2d at 448. In analyzing section 3, the court stated:

> [W]e are of the opinion that the
>> full power to ... make reasonable rules, regulations and orders by which such corporations shall be governed in the transaction of business within the State
>
> qualifies and refers only to the power given the commission by the same section to
>> prescribe just and reasonable classifications to be used, and just and reasonable rates and charges to be made and collected by public service corporation, and that ... the paramount power to

make all rules and regulations governing public service corporations not specifically and expressly given to the commission by some provision of the Constitution rests in the legislature. . . .

*Id.* at 176, 94 P.2d at 450. The court thus upheld the constitutionality of the statute because legislative control of the requirements for granting certificates of public convenience and necessity did not infringe on a power expressly granted to the Commission in the constitution. *Id.*

Subsequent cases have further narrowed the Commission's regulatory authority. In *Commercial Life Insurance Co. v. Wright*, 64 Ariz. 129, 139, 166 P.2d 943, 949 (1946), this court stated that the Commission has "no implied powers and its powers do not exceed those to be derived from a strict construction of the Constitution and implementing statutes." [7] Arizona's "Blue Sky" statute therefore did not grant the Commission power to revoke a permit for sale of securities. *Id.* at 140, 166 P.2d at 950; *see also Walker v. DeConcini*, 86 Ariz. 143, 150, 341 P.2d 933, 938 (1959) (the Commission could not entirely delegate its regulatory authority to issue certificates of necessity and convenience).

*Pacific Greyhound* and its progeny thus undercut the framers' vision of the Commission's role as set forth in the text of the constitution, as described by the framers, and in earlier case law. Nevertheless, *Pacific Greyhound* has been precedent for over fifty years. Utilities, the Commission, and countless state officials undoubtedly

---

**6.** *Pacific Greyhound* also apparently ignored language in *Arizona Eastern Railroad* that at least implied that the Commission and legislature have *concurrent* power to regulate beyond the scope of classifications, rates, and charges:

> By comparing the commanding words employed in the first part of section 3 [of article 15] with the permissive words found in the last part thereof, and measuring them by the extent of power reserved in section 10 to the legislative branch of the government, ... [i]t is perfectly clear that neither by direct language, nor by any necessary implication, from the powers granted to the Corporation Commission in section 3, is the police power in this state over a railway as a public highway, or over a railroad corporation as common

carrier, vested *exclusively* in the Corporation Commission. It is equally clear that this power of the state over a railway ... may, by a plain mandate, and in the emphatic language of the Constitution, be exercised by the lawmaking department of the government. .

*Arizona E. R.R.*, 19 Ariz. at 415–16, 171 P. at 909 (emphasis added).

**7.** For this general proposition, the court cited *State v. Board of Supervisors*, 14 Ariz. 222, 127 P. 727 (1912), a case not involving the Commission at all but dealing with the power of a board of equalization—a statutorily created entity. Obviously, the legislature's power over commissions it creates is greater than its power over those the constitution creates.

have relied on that case. Although we examine such precedent critically in light of the history and text of the constitution, we do not readily overturn it, especially if it is possible to resolve the questions presented without disturbing that precedent. In the present case, therefore, we measure the Commission's regulatory power by the doctrine apparently established by *Pacific Greyhound* and its progeny—that the Commission has no regulatory authority under article 15, section 3 except that connected to its ratemaking power.[8]

### C. Interpretation of Ratemaking Power— *Ethington v. Wright*

Ten years after *Pacific Greyhound,* this court examined the extent of the Commission's ratemaking power in *Ethington v. Wright,* 66 Ariz. 382, 189 P.2d 209 (1948). *Ethington* dealt with a statute regulating the Commission's methods of establishing fair property values for public service corporations. *Id.* at 392–94, 189 P.2d at 216–17. The statute commanded the Commission to make agreements with the Federal Power Commission regarding methods of ascertaining the fair market value of utility property and provided that these methods would become binding on all parties concerned. *Id.* at 392–93, 189 P.2d at 216–17.

*Ethington* declared the statute unconstitutional in light of the Commission's exclusive authority to set rates. Because establishing fair property values is "a necessary step" in ratemaking, and article 15, section 14 of the constitution requires the Commission to ascertain the fair value of utility property, "it follows that the duty, power, and procedure to be followed to ascertain such fair value are likewise within the exclusive prerogatives of the Corporation Commission." *Id.* at 392, 189 P.2d at 216. Thus, the court recognized that the Commission's power goes beyond strictly setting rates and extends to enactment of the rules and regulations that are reasonably

necessary steps in ratemaking. Other cases have recognized that the Commission constitutionally "may exercise all powers which may be necessary or essential in connection with the performance of its duties." *Garvey v. Trew,* 64 Ariz. 342, 346–47, 170 P.2d 845, 848, *cert. denied,* 329 U.S. 784, 67 S.Ct. 297, 91 L.Ed. 673 (1946). As we later explained, "[t]he commission in exercising its rate-making power of necessity has a range of legislative discretion." *Simms v. Round Valley Light & Power Co.,* 80 Ariz. 145, 154, 294 P.2d 378, 384 (1956).

■ From examining our prior case law in context with the framers' intent and constitutional text, we conclude that even assuming we restrict the Commission's regulatory power to its ratemaking function, we must give deference to the Commission's determination of what regulation is reasonably necessary for effective ratemaking.

With this in mind, we proceed to determine the validity of the Proposed Rules.

## V. COMMISSION'S POWER TO ADOPT THE PROPOSED RULES

### A. The Commission's Ratemaking Power

■ The Commission argues that the validity of the reporting requirements has been settled by the decisions in *APS I* and *APS II.* While there is much to be said for this view, we believe the reporting requirements need not be separated from the approval provisions of the Proposed Rules. Indeed, the reporting requirements might be useless without the approval provisions. We therefore determine the validity of the reporting requirements along with the approval provisions of the Proposed Rules as an entire regulatory scheme.

The Commission argues that the Proposed Rules' reporting requirements and approval provisions are reasonably connect-

---

**8.** We use the term "apparently established" because the language of *Pacific Greyhound* is less than clear. The court holds that the legislature has the "paramount power" to regulate in areas other than those concerned with ratemaking. 54 Ariz. at 176–77, 94 P.2d at 450. It does not state whether "paramount power" means "exclusive power," or "concurrent power" with a "power to override" Commission regulations. Because of our view of the nature of the regulations in question (*see infra* section V(A)), we need not resolve this ambiguity at this time.

ed to and necessary for its constitutional, exclusive ratemaking power. The Commission submits that article 15, section 3, providing that the Commission have "full power to ... make reasonable rules, regulations and orders by which [public service] corporations shall be governed in the transaction of business within the State," allows the Commission to do more than merely set rates and tariffs; it encompasses the authority to regulate corporate structure and capitalization as part of, and when relevant to, the ratemaking function. Applying the language in *Ethington*, the Commission interprets the Proposed Rules governing transactions between public service corporations and their affiliates as a "necessary step" in effective rate regulation. *Ethington*, 66 Ariz. at 392, 189 P.2d at 216.

The Attorney General and the Utilities Group argue that *Pacific Greyhound* restricted the Commission's section 3 regulatory authority to direct rate regulation. *See Pacific Greyhound*, 54 Ariz. at 176, 94 P.2d at 450. The Commission, they contend, has no authority to become involved in management issues indirectly related to rates because such involvement is not necessary in setting rates. *See Ethington*, 66 Ariz. at 392, 189 P.2d at 216. As noted, however (*see supra* section IV), what is necessary must be interpreted in light of the Commission's "range of legislative discretion." *Simms*, 80 Ariz. at 154, 294 P.2d at 384. We interpret necessity in light of the framers' intent of the Commission's function (*see supra* section III): to protect consumers from abuse and overreaching by public service corporations.

The Proposed Rules arguably prevent utilities from endangering their assets through transactions with their affiliates. If such transactions damage a utility company's assets or net worth, the company will have to seek higher rates for survival. Thus, transactions with affiliated corporations could have a direct and devastating impact on rates. Given the framers' intent, historical background, and precedent, we believe the Commission's regulatory power permits it to require information regarding, *and* approval of, all transactions between a public service corporation and its affiliates

that may significantly affect economic stability and thus impact the rates charged by a public service corporation. As one constitutional framer stated, "the work of fixing rates is the most complicated subject in the economic world. There are all sorts of things to be taken into consideration in fixing rates...." *Constitutional Convention, supra,* at 979 (remarks of Delegate Cunniff). In our view, the regulatory aspects of the Proposed Rules are reasonably necessary for ratemaking and are within the Commission's discretionary authority. *Simms,* 80 Ariz. at 154, 294 P.2d at 384.

We find support for this view in the opinions of other courts that have also recognized the effect of corporate structures, and dealings within those structures, on utility rates. As the California Supreme Court stated in *General Telephone Co. v. Public Utilities Comm'n,* 34 Cal.3d 817, 670 P.2d 349, 355, 195 Cal.Rptr. 695, 701 (1983), the California commission, for many years, has "refused to recognize the distinction between operating companies and their affiliates or parents and has looked directly to the profits of the parent on 'sales' to affiliates when assessing the proper rate base."

In *Baltimore Gas & Electric Co. v. Heintz,* 760 F.2d 1408, 1424 (4th Cir.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985), the court recognized that a statute regulating corporate structure of public service corporations was "but one subsection of an elaborate public service corporation law, one of the primary purposes of which [was] to regulate the rates charged to the public by the utility and which involves a balancing of the investor and consumer interests." *See generally* G. Monique Escudero, Note, *The Constitutionality of State Regulation of Public Utility Holding Companies,* 43 Wash. & Lee L.Rev. 497, 506 (1986); *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 301, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316 (1988) ("natural gas company's capital structure is related directly to the rates" allowed by regulatory commission).

Arguing that such a conclusion will allow the Commission to invade every manage-

ment decision of utility companies or their affiliates under the guise of ratemaking, the Attorney General and the Utilities Group urge us to follow the California Supreme Court's opinion in *Pacific Telephone & Telegraph Co. v. Public Utilities Comm'n,* 34 Cal.2d 822, 215 P.2d 441, 445 (1950), which held that similar regulations were an impermissible invasion of management. We are not persuaded, and agree instead with that court's more recent pronouncement in *General Telephone:*

> [T]he *Pac. Tel.* court's observations regarding the commission's powers to control the relationship between utilities and their parents or affiliates have succumbed to regulatory realism.... "[T]he utility enterprise must be viewed as a whole without regard to the separate corporate entities...."

*General Tel.,* 670 P.2d at 355, 195 Cal.Rptr. at 701 (quoting *City of Los Angeles v. Public Util. Comm'n,* 7 Cal.3d 331, 344, 497 P.2d 785, 795, 102 Cal.Rptr. 313, 323 (1972)). The invasion of management arguments fail to recognize the special relationship between affiliated companies and the strong potential that transactions between affiliates will affect rates.

Whatever the historical justification for looking at more than setting a fair return on a predetermined value, current events in this state and others prove the wisdom and necessity of a broader view of what is involved in ratemaking. *See supra* note 4; Joan G. Fickinger, Comment, *Jurisdiction of State Regulatory Commissions Over Public Utility Holding Company Diversification,* 15 Loy.U.Chi.L.J. 87 (1983) (discussing efforts of commissions in Michigan, Illinois, New York, and Connecticut to regulate utility diversification). Indeed, they show that intercorporate dealings and reorganizations of public utilities can have disastrous consequences for the economic viability of the entire enterprise, and that such misfortunes are visited not only on the stockholders of the company but the ratepayers of the state. Addressing an aspect of utility diversification, one commentator stated, "absent regulatory oversight, it is not clear how ratepayers can be protected from holding company account-

ing abuses such as unrecorded cross-subsidization among subsidiaries." Fickinger, *supra,* at 96.

Similar concerns prompted Congress to adopt the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 (1981). In extensive studies that preceded the Act, the Federal Trade Commission determined that public utility holding companies pose various threats to consumers, including charging excessive fees to the public utility, utilizing fraudulent accounting practices, siphoning public utility revenue, and creating fragile corporate structures by risky management practices. *See* 15 U.S.C.A. § 79a(b) (1976); *American Power Co. v. S.E.C.,* 329 U.S. 90, 100–02, 67 S.Ct. 133, 140–41, 91 L.Ed. 103 (1946); *North Am. Co. v. S.E.C.,* 327 U.S. 686, 701, 66 S.Ct. 785, 794, 90 L.Ed. 945 (1946); *Escudero, supra,* at 498 n. 5 (citing S.Doc. No. 92, 70th Cong. 1st Sess. 842–82 (1927)).

While diversification may be a wise financial decision for utility companies in some or even most instances, many critics "fear that financial improvement through *unregulated* diversification will come at the expense of utility ratepayers." Fickinger, *supra,* at 95 (emphasis added). As we have previously noted, it was exactly that type of calamity that moved our founders to establish an independent, elected corporation commission with broad legislative ratemaking powers. The Commission was not designed to protect public service corporations and their management but, rather, was established to protect our citizens from the results of speculation, mismanagement, and abuse of power. To accomplish those objectives, the Commission must have the power to obtain information about, and take action to prevent, unwise management or even mismanagement and to forestall its consequences in intercompany transactions significantly affecting a public service corporation's structure or capitalization. It would subvert the intent of the framers to limit the Commission's ratemaking powers so that it could do no more than raise utility rates to cure the damage from inter-company transactions.

Thus, we do not believe the Proposed Rules so interfere with management functions that they constitute an attempt to control the corporation rather than an attempt to control rates. The Commission must certainly be given the power to prevent a public utility corporation from engaging in transactions that will so adversely affect its financial position that the ratepayers will have to make good the losses, and it cannot do so in any common-sense manner absent the authority to approve or disapprove such transactions in advance. To put it simply, the Commission was given the power to lock the barn door before the horse escapes.

We conclude, therefore, that even given *Pacific Greyhound*'s restrictive interpretation of article 15, section 3, the Proposed Rules are reasonably necessary for ratemaking. The Commission therefore has power to enact them even in the absence of regulatory authority separate from ratemaking. In reaching this conclusion, we do not reinterpret the constitution. We merely determine what is necessary to fulfill the framers' intent with respect to ratemaking in light of modern corporate practices and regulatory realism.[9]

This conclusion makes it unnecessary to consider the Commission's arguments regarding the statutory authority, if any, for the promulgation of the Proposed Rules.

B. The Commerce Clause

■ The Utilities Group lastly challenges the Proposed Rules on the basis that they violate the Commerce Clause of the United States Constitution. The Attorney General did not consider the Commerce Clause issue in his decision to deny certification of the rules. Letter of record from the Honorable Grant Woods, Attorney General, to James Matthews, Executive Secretary, Arizona Corporation Commission (Jan. 22, 1991). Under A.R.S. § 41–1041(A)(3), however, the Attorney General must certify that any proposed rules are "[w]ithin the power of the agency to adopt and within the legislative standards enacted." Given

the procedural posture of this case, we assume without deciding that the Attorney General *could* have refused certification of the Proposed Rules if he found a Commerce Clause violation. In the interest of judicial economy, we therefore proceed to address the Commerce Clause issue raised by the Utilities Group.

The Commerce Clause grants Congress the power "[t]o regulate commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The United States Supreme Court has long held that the Commerce Clause also limits a state's ability to interfere with interstate commerce. *See, e.g., Wyoming v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992); *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 87, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987); *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 317–18, 13 L.Ed. 996 (1852). The Supreme Court summarized its Commerce Clause analysis of state regulation in *Brown Forman Distillers Corp. v. New York State Liquor,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986).

This Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. *See, e.g., Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); *Shafer v. Farmers Grain Co.,* 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909 (1925); *Edgar v. MITE Corp.,* 457 U.S. 624, 640–43, 102 S.Ct. 2629, 2634–2641, 73 L.Ed.2d 269 (1982) (plurality opinion). When, however, a statute has only indirect effects on interstate commerce and regulates even-handedly, we have examined whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

---

9. We do not close our eyes to the possibilities of unwise regulation. Under Arizona's system, the remedy for corporate abuse is regulation, while the remedy for regulatory abuse is election.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). We have also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

*Id.* 476 U.S. at 578–79, 106 S.Ct. at 2084.

The parties agree that the Proposed Rules do not discriminate against interstate commerce or favor in-state over out-of-state interests. The Utilities Group instead argues that the Proposed Rules create a direct burden on interstate commerce because "[t]hey seek to directly and substantively control the broadest possible range of transactions," even when a utility affiliate may have no corporate connection with Arizona other than its corporate affiliation with the Arizona utility. Memorandum in Opposition to Petition for Special Action at 81. We disagree.

The Utilities Group cites *Middle South Energy v. Arkansas Public Service Comm'n,* 772 F.2d 404 (8th Cir.1985), *cert. denied sub nom. Ratepayers Fight Back v. Middle South Energy, Inc.,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986), among other cases, to support its assertion that public service commission attempts to regulate transactions between a utility and its affiliates violate the commerce clause. *Middle South Energy* upheld an injunction preventing the Arkansas Public Service Commission from holding post hoc proceedings regarding agreements between utility affiliates concerning construction of an additional power plant and the later sale of the power to be generated. *Id.* at 406–08. The agreements allocated a portion of the power to be generated to each of the utility affiliates. The court held that the state commission's actions to avoid the agreements, approximately ten years after the parties entered into them, were an attempt "to close its borders to high-cost electricity" and obtain "a preference for citizens in the regulating jurisdiction gained at the expense of out-of-state customers." *Id.* at 417. The court also stated that these actions created a direct and substantial burden on interstate commerce. *Id.*

We do not believe that the Proposed Rules have such sweeping effects. First, the rules, of course, apply only to public utilities subject to the Commission's jurisdiction. Proposed Rule R14–2–802. They require information regarding diversification activities of those public utilities and their affiliates. *See* Proposed Rules R14–2–803 to R14–2–805. Further, the rules only regulate transactions between those utilities and their affiliates. *See* Proposed Rule R14–2–804. We believe the Proposed Rules extend no further than necessary to accomplish the goals of "protect[ing] ... consumers [in Arizona] from the abuses inherent in the public utility holding company structure." *Baltimore Gas,* 760 F.2d at 1421. Unlike the commission's actions in *Middle South Energy,* the Proposed Rules were not enacted for discriminatory purposes and create only an incidental burden on interstate commerce. *See Baltimore Gas,* 760 F.2d at 1420–22 (refusing to find similar state rule regulating utilities and their holding companies per se invalid). We therefore apply the balancing test established in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

The first prong of the *Pike* balancing test is whether the rules serve a legitimate state interest. We believe they do. As the United States Supreme Court has stated, "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983). Like the regulations in *Baltimore Gas,* the Proposed Rules are designed primarily "to regulate the rates charged to the public by the utility and ... involve[ ] a balancing of the investor and consumer interests." *Baltimore Gas,* 760 F.2d at 1424. The Commission must be able to regulate corporate structures to protect consumers. *Id.* at 1424–25.

The second prong of the *Pike* test is the burden placed on interstate commerce. We recognize that the reporting requirements and approval provisions do create administrative and transactional burdens for utility companies and their affiliates. We do not believe, however, that these burdens are "clearly excessive in relation to the putative local interests" of consumer protection served by the Proposed Rules. *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. *See also Baltimore Gas*, 760 F.2d at 1425–27 (burdens on interstate commerce from rule regulating utilities and their holding companies did not outweigh local benefits). Finally, because the Proposed Rules regulate evenhandedly, we need not examine the alternatives suggested by the Utilities Group as less restrictive. *See Baltimore Gas*, 760 F.2d at 1427. *Cf. Wyoming v. Oklahoma*, —— U.S. at ——, 112 S.Ct. at 801 (because statute was discriminatory, burden fell on state to justify it in terms of local benefits and unavailability of adequate nondiscriminatory alternatives). Therefore, we hold that the Proposed Rules do not violate the Commerce Clause.

## VI. CONCLUSION

The Commission has the authority to promulgate the Proposed Rules under its constitutional ratemaking power. The Proposed Rules also do not violate the Commerce Clause. Thus, the Attorney General failed to perform a duty required by law when he refused to certify the Proposed Rules on the grounds that the Commission lacked the power to adopt the rules. We therefore grant the relief requested in the Commission's petition and direct the Attorney General to certify the Proposed Rules. This ruling, of course, does not constitute an opinion on any particular application of the rules.

MOELLER, V.C.J., CORCORAN, J., and JAMES DUKE CAMERON and FRANK X. GORDON, Jr., JJ. (retired), concur.

## APPENDIX A

R14–2–801. *Definitions*

In this article, unless the context otherwise requires:

1. "Affiliate," with respect to the public utility, shall mean any other entity directly or indirectly controlling or controlled by, or under direct or indirect common control with, the public utility. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any entity, shall mean the power to direct the management policies of such entity, whether through the ownership of voting securities, or by contract, or otherwise.

2. "Commission." The Arizona Corporation Commission.

3. "Entity." A corporation, partnership, limited partnership, joint venture, trust, estate, or natural person.

4. "Holding Company" or "Public Utility Holding Company." Any affiliate that controls a public utility.

5. "Reorganize" or "Reorganization." The acquisition or divestiture of a financial interest in an affiliate or a utility, or reconfiguration of an existing affiliate or utility's position in the corporate structure or the merger or consolidation of an affiliate or a utility.

6. "Subsidiary." Any affiliate controlled by a utility.

7. "System of Accounts." The accounting system or systems prescribed for utilities by the Commission.

8. "Utility" or "Public Utility." Any Class A investor-owned public service corporation subject to the jurisdiction of the Arizona Corporation Commission.

R14–2–802. *Applicability*

A. These rules are applicable to all Class A investor-owned utilities under the jurisdiction of the Commission and are applicable to all transactions entered into after the effective date of these rules.

B. Information furnished to the Commission in compliance with these rules will not be open to public inspection, or made public, except on order of the Commission,

or by the Commission, or a Commissioner in the course of a hearing or proceeding.

### R14-2-803. *Organization of Public Utility Holding Companies*

A. Any utility or affiliate intending to organize a public utility holding company or reorganize an existing public utility holding company will notify the Commission's Utilities Division in writing at least one hundred and twenty (120) days prior thereto. The notice of intent will include the following information:

1. The names and business addresses of the proposed officers and directors of the holding company;

2. The business purposes for establishing or reorganizing the holding company;

3. The proposed method of financing the holding company and the resultant capital structure;

4. The resultant effect on the capital structure of the public utility;

5. An organization chart of the holding company that identifies all affiliates and their relationships within the holding company;

6. The proposed method for allocating federal and state income taxes to the subsidiaries of the holding company;

7. The anticipated changes in the utility's cost of service and the cost of capital attributable to the reorganization;

8. A description of diversification plans of affiliates of the holding company; and

9. Copies of all relevant documents and filings with the United States Securities and Exchange Commission and other federal or state agencies.

10. The contemplated annual and cumulative investment in each affiliate for the next five years, in dollars and as a percentage of projected net utility plant, and an explanation of the reasons supporting the level of investment and the reasons this level will not increase the risks of investment in the public utility.

11. An explanation of the manner in which the utility can assure that adequate capital will be available for the construction of necessary new utility plant and for improvements in existing utility plant at no greater cost than if the utility or its affiliate did not organize or reorganize a public utility holding company.

B. The Commission Staff will, within thirty (30) days after receipt of the notice of intent, notify the Applicant of any questions which it has concerning the notice or supporting information. The Commission will, within sixty (60) days from the receipt of the notice of intent, determine whether to hold a hearing on the matter or approve the organization or reorganization without a hearing.

C. At the conclusion of any hearing on the organization or reorganization of a utility holding company, the Commission may reject the proposal if it determines that it would impair the financial status of the public utility, otherwise prevent it from attracting capital at fair and reasonable terms, or impair the ability of the public utility to provide safe, reasonable and adequate service.

### R14-2-804. *Commission Review of Transactions Between Public Utilities and Affiliates*

A. A utility will not transact business with an affiliate unless the affiliate agrees to provide the Commission access to the books and records of the affiliate to the degree required to fully audit, examine or otherwise investigate transactions between the public utility and the affiliate. In connection therewith, the Commission may require production of books, records, accounts, memoranda and other documents related to these transactions.

B. A utility will not consummate the following transactions without prior approval by the Commission:

1. Obtain a financial interest in any affiliate not regulated by the Commission, or guarantee, or assume the liabilities of such affiliate;

2. Lend to any affiliate not regulated by the Commission, with the exception of short-term loans for a period less than 12

(twelve) months in an amount less than $100,000; or

3. Use utility funds to form a subsidiary or divest itself of any established subsidiary.

C. The Commission will review the transactions set forth in subsection B above to determine if the transactions would impair the financial status of the public utility, otherwise prevent it from attracting capital at fair and reasonable terms, or impair the ability of the public utility to provide safe, reasonable and adequate service.

D. Every transaction in violation of subsection A or B above is void, and the transaction shall not be made on the books of any public service corporation.

E. The system of accounts used by the public utility will include the necessary accounting records needed to record and compile transactions with each affiliate.

R14-2-805. *Annual Filing Requirements of Diversification Activities and Plans*

A. On or before April 15th of each calendar year, all public utilities meeting the requirements of R14-2-802 and public utility holding companies will provide the Commission with a description of diversification plans for the current calendar year that have been approved by the Boards of Directors. As part of these filings, each public utility meeting the requirements of R14-2-802 will provide the Commission the following information:

1. The name, home office location and description of the public utility's affiliates with whom transactions occur, their relationship to each other and the public utility, and the general nature of their business;

2. A brief description of the business activities conducted by the utility's affiliates with whom transactions occurred during the prior year, including any new activities not previously reported;

3. A description of plans for the utility's subsidiaries to modify or change business activities, enter into new business ventures or to acquire, merge or otherwise establish a new business entity;

4. Copies of the most recent financial statements for each of the utility's subsidiaries;

5. An assessment of the effect of current and planned affiliated activities on the public utility's capital structure and the public utility's ability to attract capital at fair and reasonable rates;

6. The bases upon which the public utility holding company allocates plant, revenue and expenses to affiliates and the amounts involved; an explanation of the derivation of the factors; the reasons supporting that methodology and the reasons supporting the allocation;

7. An explanation of the manner in which the utility's capital structure, cost of capital and ability to raise capital at reasonable rates have been affected by the organization or reorganization of the public utility holding company;

8. The dollar amount transferred between the utility and each affiliate during the annual period, and the purpose of each transfer;

9. Contracts or agreements to receive, or provide management, engineering, accounting, legal, financial or other similar services between a public utility and an affiliate;

10. Contracts or agreements to purchase, or sell, goods or real property between a public utility and an affiliate; and

11. Contracts or agreements to lease goods or real property between a public utility and an affiliate.

B. After reviewing the diversification plans, the Commission may, within ninety (90) days after plans have been provided, request additional information, or order a hearing, or both, should it conclude after its review that the business activities would impair the financial status of the public utility, otherwise prevent it from attracting capital at fair and reasonable terms, or impair the ability of the public utility to provide safe, reasonable and adequate service.

**R14-2-806.** *Waiver from the Provisions of this Article*

A. The Commission may waive compliance with any of the provisions of this Article upon a finding that such waiver is in the public interest.

B. Any affected entity may petition the Commission for a waiver by filing a verified application for waiver setting forth with specificity the circumstances whereby the public interest justifies noncompliance with all or part of the provisions of this Article.

C. If the Commission fails to approve, disapprove, or suspend for further consideration an application for waiver within thirty (30) days following filing of a verified application for waiver, the waiver shall become effective on the thirty-first (31st) day following filing of the application.