**SOUTHERN UNION COMPANY,**
**Plaintiff,**

v.

**MISSOURI PUBLIC SERVICE**
**COMMISSION, et al.,**
**Defendants.**

**No. 99–4263–CV–C–9.**

United States District Court,
W.D. Missouri,
Central Division.

March 12, 2001.

─────────────

Mark G. Anderson, Brydon, Swearengen & England, Paul Boudreau, Brydon, Swearengen, & England, P.C., Timothy Stewart, Brydon, Swearengen & England,

P.C., Jefferson City, MO, for Southern Union Company, plaintiffs.

Bart A. Matanic, Attorney General's Office, Jefferson City, MO, for Missouri Public Service Commission, Sheila Lumpe, M. Dianne Drainer, Harold Crumpton, Connie Murray, Robert Schemenauer, defendants.

## ORDER

LAUGHREY, District Judge.

Pending before the Court are the parties' cross motions for summary judgment on Counts I and II. The parties have agreed that there are no factual issues in dispute and the cross motions can be decided as a matter of law. The Plaintiff's motion is denied and Defendants' motion is granted.

## I. Factual Background

Southern Union has its principal office and place of business in Austin, Texas. Southern Union operates a natural gas distributor serving approximately 1,153,-000 customers in the states of Texas, Missouri, Pennsylvania and Florida. In Missouri, Southern Union operates through Missouri Gas Energy ("MGE"). MGE provides natural gas services to approximately 484,000 customers located in Kansas City, St. Joseph, Joplin, Monett, and other cities throughout central and western Missouri. Defendants are the officers and directors of the Missouri Public Service Commission ("Commissioners"). The Commissioners have the authority to regulate and supervise public utilities having operations in the State of Missouri. As a public utility doing business in Missouri, Southern Union is subject to regulatory oversight by the Commissioners.

On April 6, 1998, Southern Union filed an application with the Commissioners seeking blanket approval to make non-control investments, either directly, or through a subsidiary, in the stocks or bonds of non-Missouri electric or natural gas utilities. It did not identify specific stocks or bonds which it wanted to purchase. An evidentiary hearing was held and Southern Union's application was rejected by the Commissioners. The Commissioners reasoned that they did not have statutory authority to grant the blanket relief requested. The Commissioners also found that, even if they had statutory authority to grant the relief requested, doing so would be detrimental to the public interest. The Commissioners identified the following potential losses that might occur in the absence of review by the Public Service Commission (PSC): loss on transactions for which post-hoc review would not provide adequate ratepayer protection; operational effect (such as diversion of resources to evaluate targets) that might not be adequately addressed in a rate case; and, Southern Union might prefer engaging in transactions with a company in which it has an interest to the detriment of ratepayers.

## II. Discussion

Since 1913 the State of Missouri has required all utility companies operating in the state to receive from the Commissioners prior approval before purchasing the stock of another utility company. Missouri Revised Statute 383.190(2) provides that:

No [gas corporation, electrical corporation, water corporation or sewer corporation] shall directly or indirectly acquire the stock or bonds of any other corporation incorporated for, or engaged in, the same or similar business, or proposing to operate or operating under a franchise from the same or similar business ... unless ... authorized to do so by the [Public Service Commission].

The law applies equally to the purchase of stocks or bonds issued by in state or out of state utility companies.[1] Southern Union acknowledges that the purpose of the law is to permit the Commissioners to monitor the corporate structure of utility companies doing business in the State. Such monitoring is necessary to prevent abuses which previously occurred in the utility industry. The federal government in response to similar abuses that burdened ratepayers during the Depression adopted the Public Utility Holding Company Act (PUHCA). *See* Douglas W. Howes, Utility Holding Companies, § 206, (1987). PUHCA also regulates the corporate structure of utility companies. Among other things, it provides that a company must register with the Securities and Exchange Commission (SEC) as a holding company at any time such company controls ten percent or more of the voting stock of a public utility. A company's registration as a utility holding company triggers additional regulation of such company's investments in both utility and non-utility stock. 15 U.S.C § 79 *et seq.* In contrast, Missouri's statute does not contain a ten percent threshold. It requires PSC approval before a utility doing business in Missouri can purchase any stock in a utility.

Southern Union contends that RSMo 383.190(2) is preempted by PUHCA and the Securities and Exchange Act (SEA). Alternatively, Southern Union contends that the statute violates the dormant Commerce Clause. The Court will first address the preemption issue because it provides a context for the more complicated dormant Commerce Clause analysis.

## A. Preemption

Preemption is a narrow doctrine. "[A]bsent an explicit indication by Congress of an intent to preempt state law, a state statute is preempted only where compliance with both federal and state regulations is a physical impossibility or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 78–79, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (citations omitted). Southern Union argues that RSMo § 383.190(2) substantially frustrates PUHCA and the SEA and is therefore preempted. The Court disagrees.

■ The Williams Act, an amendment to the SEA of 1934, regulates tender offers. Southern Union contends that RSMO § 383.190(2) frustrates the Williams Act because the Missouri statute requires prior approval of utility stock purchases and this causes substantial delay. In contrast, the Williams Act provides that there should only be a ten day delay for proration of tender offers. 15 U.S.C. § 78n (d)(6). Southern Union argues that by requiring prior approval of investments, the Missouri statute results in substantially more than a ten day delay when Southern Union seeks to purchase utility stock

The flaw in Southern Union's analysis is that the issue before the Court has nothing to do with tender offers to take control of a corporation. Southern Union has only asked the Commissioners for approval to purchase non-control investments in utilities. Furthermore, the Missouri statute which deals with any investments in utility companies is not comparable to the Williams Act, which deals only with control-investments. Even if the two dissimilar statutes could be compared, the Su-

---

1. Southern Union crafted its request to the PSC to only address the statutes' application to out of state investments. The statute itself, however, makes no distinction between in state and out of state investments.

preme Court has held that delay, in and of itself, is not a sufficient reason to find that a State statute is preempted by the Williams Act.

> In our view the possibility that [a state statute] will delay some tender offers is insufficient to require a conclusion that the Williams Act preempts the [state statute] .... The long standing prevalence of state regulation [of corporations] suggests that, if Congress had intended to preempt all state laws that delay the acquisition of voting control following a tender offer, it would have said so explicitly.

*CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987). Similarly, if Congress had intended the Williams Act to preempt every utility regulation which incidentally delayed stock purchases, it would have said so explicitly.

■ Southern Union also argues that the Commissioners' regulation of Southern Union's non-control investments frustrates Congress' mandate for deregulation of the securities market. In 1975, Congress passed Section 78k–1, amending the SEA, which instructs the SEC to protect investors and maintain fair and orderly markets by creating more efficient and effective market operations. 15 U.S.C. § 78k–1. The amendment also provides that the SEC should promote efficiency of the market through the removal of unnecessary burdens on competition. 15 U.S.C. § 78k–1(a)(2). Because the Missouri regulation in part restricts investments in non-Missouri utilities, Southern Union asserts that the Commissioners are erecting a barrier in the national market, which frustrates the SEC's jurisdiction and the SEA's policy of a competitive national market.

However, "Congress, the courts and the [Securities Exchange Commission] have made explicit that federal regulation was not designed to displace state blue sky laws that regulate interstate securities transactions." *A.S. Goldmen & Co., Inc. v. New Jersey Bureau of Securities*, 163 F.3d 780, 781 (3d Cir.1999) (citing 15 U.S.C. § 77r(c)). *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 137, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) (commenting that "Congress, in the securities field, has not adopted a regulation system wholly apart from and exclusive of state regulation").

■ Finally, Southern Union claims that the Commissioners have frustrated the purpose of PUHCA by requiring advance approval of all utility stock purchases because PUHCA regulations are only triggered when a utility purchases ten percent or more of the voting securities of a public-utility company. The Court finds this argument unpersuasive.

The purpose of PUHCA is to supplement State regulation, not supplant it. *See Rochester Telephone Corp. v. Public Service Comm'n of State of New York*, 201 A.D.2d 31, 614 N.Y.S.2d 454, 457 (1994); *Alabama Elec. Co-op., Inc. v. Securities and Exchange Comm'n*, 353 F.2d 905, 907 (D.C.Cir.1965). PUHCA provides in relevant part that it shall not preempt additional State jurisdiction over utility holding companies. 15 U.S.C. § 79a. While State jurisdiction cannot conflict with any provision of PUHCA, it can supplement it. *Id.*

In *Indiana and Michigan Power Co. v. State*, 405 Mich. 400, 275 N.W.2d 450 (1979), the Court held that neither PUHCA nor the SEA divested public service commissions of control over the securities offerings of public utilities. The Court explained that PUHCA includes a clear statement of "Congressional intent not to remove from the states power over the securities of local subsidiary operating companies as exercised through the state public service commissions." *Id.* at 412,

275 N.W.2d 450. Instead, the Court explained that "a partnership of concurrent state-federal control existed." *Id.* Finally, the Court noted that Congress did not intend to place sole regulatory control of security issuances to the SEC under the PUHCA. *Id.* at 414, 275 N.W.2d 450.

In *Baltimore Gas & Electric Co. v. Heintz*, 760 F.2d 1408 (4th Cir.1985), the Fourth Circuit concluded that a Maryland statute which forbid utility holding companies was not preempted by PUHCA. The Fourth Circuit rejected the argument that because PUHCA merely regulated the formation of utility holding companies, a State could not forbid their formation altogether.

> Congress' determination to do away with public utility holding companies unless certain conditions are met ... does not indicate a legislative intent that public utility holding companies shall be outside the reach of a prohibitory state statute. *Id.* at 1416.[2]

Similarly, merely because Congress sets ten percent as the threshold for SEC regulation of utility holding companies does not mean that Missouri is frustrating Congress' goals by requiring approval of all utility stock purchases by utility companies doing business in Missouri. The Missouri statute is responsive to Congress' concern about economic abuses that were associated with utility holding companies.

**B. Dormant Commerce Clause**

The Commerce Clause authorizes Congress to regulate interstate commerce. By negative implication, the Commerce Clause has been interpreted to limit the authority of the States to regulate inter-state commerce. Hence, even when Congress has not legislated under the Commerce Clause and the Commerce Clause is therefore dormant, a State may still be prohibited from regulating interstate commerce. *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984). The precise parameters of the doctrine are subject to continuing debate. *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 117 S.Ct. 1590, 1615–1620, 137 L.Ed.2d 852 (1997) (Thomas, Scalia and Rehnquist, JJ., dissenting).

While generalizations are difficult given the myriad of factual contexts in which dormant Commerce Clause problems arise, the scrutiny to which a State statute is subject depends on whether its impact on interstate commerce is direct and substantial and is designed to obtain an economic advantage for the State at the expense of its sister States. *Middle South Energy, Inc. v. Arkansas Public Service Commission*, 772 F.2d 404, 416 (8th Cir. 1985). In such cases, the statute is presumptively invalid. "[W]here simple economic protectionism is effected by state legislation, a virtual per se rule of invalidity has been erected." *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). On the other hand, "[w]here a statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).[3] South-

---

**2.** The SEC had filed an amicus brief in that case expressing this precise point. The SEC's position on this matter further demonstrates that Missouri's statute is not preempted by PUHCA.

**3.** The Supreme Court has acknowledged that there is "no clear line between these two strands of analysis." *General Motors Corp. v. Tracy*, 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).

ern Union contends that RSMO § 383.190.2 is a per se violation of the dormant Commerce Clause because it regulates economic activity outside the State, i.e., stock sales of utility companies which do no business in Missouri. It also contends that the statute cannot survive the Pike balancing test.

## 1. Per Se Violation

■ To support its contention that § 383.190.2 is a per se violation of the dormant Commerce Clause, Southern Union relies primarily on four price protection cases, *New England Power Co. v. New Hampshire*, 455 U.S. 331, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982); *Healy v. Beer Institute*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986); and *Middle South Energy, Inc. v. Arkansas Public Service Commission*, 772 F.2d 404 (1985). Each case is factually distinguishable because each case involves a State attempting to gain a direct economic benefit for its citizens at the expense of its sister States. In contrast, § 383.190(2) does not attempt to gain an advantage for the citizens of Missouri at the expense of the citizens of a sister State. The purpose of the statute is to ensure that the Commissioners will be able to determine how to maintain an economically viable utility provider without excessive exploitation of a captive market. While this regulatory structure benefits both Southern Union as a monopoly and the ratepayers of Missouri, the benefits are not achieved at the expense of a sister State.

In *New England Power Co. v. New Hampshire*, the State of New Hampshire passed a statute which mandated reduced utility rates for its citizens because some of the power they received was generated by hydro-electric dams located in New Hampshire. Effectively, New Hampshire was trying to retain for its citizens the natural resources located within its boundaries. This was classic State protectionism that impeded the free flow of products across state lines. Similarly, in *Middle South*, the Eighth Circuit declared invalid an Arkansas statute which prevented expensive energy from entering the State. The consequence of Arkansas' embargo would fall directly on ratepayers in sister States who would have to purchase the more expensive nuclear generated power that Arkansas did not want. The two beer cases, *Healy* and *Brown–Forman* involved State statutes which reduced beer prices intrastate but had the effect of directly regulating beer prices in the markets of the surrounding States.

In contrast, § 383.190.2 does not directly burden the interstate market of utility stocks. Any Missouri corporation or foreign corporation may participate freely in that national utility stock market so long as it does not own a utility in Missouri. In this regard, *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), is instructive. The Maryland statute at issue in that case prohibited a producer or refiner of petroleum products from operating retail gas stations in the State. The refiners argued that this would cause some out of state refiners to stop selling in Maryland. In response, the Supreme Court stated:

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners.... [I]nterstate commerce is not subject to an impermissible burden simply because an otherwise valid regulation causes some businesses to shift from one interstate supplier to another.... [The commerce] clause pro-

tects interstate markets, not particular interstate firms from prohibitive or burdensome regulations.

*Exxon Corp. v. Governor of Maryland,* at 127, 98 S.Ct. 2207. The fact that Southern Union does not have the unfettered right to participate in the interstate market of utility stocks does not mean that the market has been impermissibly burdened. Missouri Revised Statutes Section 383.190.2 is not a per se violation of the Commerce Clause.

## 2. *Pike* Balancing Test

Southern Union also contends that § 383.190.2 violates the Commerce Clause under the *Pike* balancing test. In *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court developed a balancing test to determine whether indirect regulation of interstate commerce violates the dormant Commerce Clause. The *Pike* balancing test requires that a State not impose excessive burdens upon interstate commerce in relation to the local interests served by the statute. *Id.* at 142, 90 S.Ct. 844. Under the *Pike* test, "[a] state statute that seeks evenhandedly to effectuate a legitimate state interest and whose effects on interstate commerce are incidental has been generally upheld unless the burden on interstate commerce is clearly excessive in relation to the putative local benefits." *Baltimore Gas,* 760 F.2d at 1420 (citing *Pike,* 397 U.S. at 142, 90 S.Ct. 844).

Southern Union relies heavily on *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), to support its argument that the Missouri statute fails the Pike balancing test. *Edgar* is distinguishable. The *Edgar* Court implemented the *Pike* balancing test and determined that the statute at issue did not promote the State's claimed purpose of protecting ratepayers. *Edgar,* 457 U.S. at 643–46, 102 S.Ct. 2629. Here, Missouri has a valid interest in assuring the supply of natural gas for its citizens at reasonable rates, and that interest is protected by § 383.190.2.

Support for this conclusion is found in *Baltimore Gas & Elec. Co. v. Heintz,* 760 F.2d 1408 (4th Cir.1985). *Baltimore Gas* involved a Maryland statute that prohibited a domestic corporation from purchasing the securities of another domestic corporation operating as a utility in Maryland. Plaintiff sought acquisition of another Maryland corporation and the Maryland Public Service Commission refused to authorize the acquisition. Plaintiff argued that the statute violated the Commerce Clause. The Fourth Circuit concluded that the Maryland statute survived the *Pike* balancing test stating that a "state may regulate the rates utilities charge consumers either directly, by requiring commission approval of rate increases, or indirectly, by controlling certain investments and attempts at diversification by the utility." *Id.* at 1425. The Fourth Circuit went on to hold that the statute could not be characterized as economic protectionism because it "was not designed to favor local commerce over out-of-state commerce and imposes no burden on interstate commerce that it does not impose on intrastate commerce." *Baltimore Gas & Elec. Co.,* 760 F.2d at 1423. Like the Missouri statute, the Maryland statute regulated evenhandedly and did not violate the Commerce Clause.

While not factually on point, *General Motors Corp. v. Tracy,* 519 U.S. 278, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997), is the most compelling authority for the Court's conclusion that Missouri Revised Statutes § 383.190.2 survives the Pike balancing test.[4] In that case the plaintiff alleged

---

4. While the facts in *General Motors* are not on point, the reasoning of the Supreme Court

that Ohio had impermissibly burdened interstate commerce by giving a tax exemption to State regulated natural gas distributors but denying the exemption to unregulated distributors of natural gas. According to the plaintiffs, the effect of this statute was to "favor some interstate commerce while disfavoring all out of state commerce." *General Motors,* 117 S.Ct. at 819. To reach its conclusion that Ohio's differential tax treatment did not violate the dormant Commerce Clause, the Supreme Court focused on the long history of State regulation of natural gas distribution in the United States and the deference which both Congress and the courts have shown to the States in this area.

The courts have consistently held that regardless of the dormant commerce clause States have the "power to regulate as a matter of public concern all direct sales of gas to consumers within their border absent Congressional prohibition of such State statutes." *General Motors,* 519 U.S. at 289, 117 S.Ct. 811. Also *see Pennsylvania Gas Co. v. Public Serv. Comm'n of N.Y.,* 252 U.S. 23, 28–31, 40 S.Ct. 279, 64 L.Ed. 434 (1920), and *Illinois Natural Gas Co. v. Central Illinois Pub. Serv. Co.,* 314 U.S. 498, 504–05, 62 S.Ct. 384, 86 L.Ed. 371 (1942).

Congress has also been careful to protect the right of States to regulate natural gas monopolies which do business in their territory. The Natural Gas Act (NGA) was adopted "to protect consumers against exploitation at the hands of the natural gas companies" and was drafted "with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way." *General Motors,* 519 U.S. at 292, 117 S.Ct. 811. In fact, when the

Supreme Court opened the door to more federal regulation of natural gas companies in *Federal Power Comm'n v. East Ohio Gas Co.,* 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950), Congress amended the NGA to return exclusive jurisdiction over natural gas distribution companies to the States. *General Motors,* 519 U.S. at 293, 117 S.Ct. 811.

Given this history, the Supreme Court in *General Motors* stated:

> Where a choice is possible, ... the importance of traditional regulated service to the captive market makes a powerful case against any judicial treatment that might jeopardize the [public utilities'] continuing capacity to serve the captive market.

*General Motors,* 519 U.S. at 304, 117 S.Ct. 811. The Supreme Court also recognized that it did not have expertise in the area of natural gas distribution, nor did it have the institutional resources to predict how invalidating a State regulation would affect consumers and the monopoly. Congress, on the other hand, had the power to address the issue directly if the balance between local concerns and interstate interests needed adjustment. In conclusion the Supreme Court stated:

> State regulation of natural gas sales to consumers serves important interest in health and safety in fairly obvious ways, in that requirements of dependable supply and extended credit assure that individual buyers of gas for domestic purposes are not frozen out of their houses in the cold months. We have consistently recognized the legitimate state pursuit of such interests as compatible with the commerce clause which was 'never intended to cut the states off from legislating on all subjects related to the health, life and safety of their

concerning the proper balance between a State's interest in regulating utilities and a statute's incidental burden on interstate commerce is equally applicable to Southern Union's dispute with the Commissioners.

citizens, though the legislation might indirectly affect the commerce of the country.'

*General Motors*, 519 U.S. at 306, 117 S.Ct. 811 (citations omitted).

Revised Statutes of Missouri, § 383.190.2 places a minimal and indirect burden on interstate commerce. It requires utilities that do business in Missouri to get prior approval from the Commissioners before investing in other utility companies. Even if all Missouri utility companies were completely excluded from the interstate market for utility investments, it would likely have a small impact on interstate commerce. This burden must be weighed against the substantial interest of the State in maintaining a steady supply of natural gas for its citizens. While the Court lacks the expertise to understand all the benefits of pre-approval of stock investments, it is apparent that the statute has served the interest of the State well, given the longevity of the statute. The fact that Congress enacted similar legislation, the PUHCA, also suggests that regulatory oversight of the corporate structure of utility companies serves the public interest. Finally, the Missouri statute has been in place since 1913. If it placed an impermissible burden on interstate commerce, one would have expected Congress to intervene to adjust the balance between interstate concerns and local interests.

Accordingly, for the foregoing reasons, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment on Counts I and II (Doc. 41) is DENIED. It is further

ORDERED that Defendants' Motion for Summary Judgment on Counts I and II (Doc. 37) is GRANTED.